[Civ. No. 14208. Third Dist. June 13, 1975.]

BBD TRANSPORTATION COMPANY, INC.,
Plaintiff and Respondent, v.
DALE BULLER et al., Defendants and Appellants.

### COUNSEL

Myers, Praetzel & Garety and Wallace S. Myers for Defendant and Appellant.

Kroloff, Belcher, Smart, Ford & Norris, Thomas O. Perry and Robert A. Haughwout for Plaintiff and Respondent.

### OPINION

**PARAS, J.**—This is an action for damages incurred when a trailer load of steel pipe toppled into a ravine while it was being hauled by tractor on October 21, 1965, from Richmond, California, to the Fricot School for Boys (near San Andreas) in Calaveras County, California. Defendant Dale Buller, doing business as Napa Drayage and Warehouse Co. (hereinafter "Buller") appeals from a judgment of the Calaveras County Superior Court awarding plaintiff BBD Transportation Co., Inc., a corporation (hereinafter "BBD"), damages in the amount of $9,357.24.

The trial court, sitting without a jury, found that both plaintiff and defendant were radial highway common carriers, that BBD was the prime hauler of the load of pipe for the customer, and that on or about October 20, 1965, BBD and Buller entered into an oral subhaul agreement whereby Buller was to haul the load from Richmond to its destination. From these findings, the court concluded that Buller was by virtue of section 2194 of the Civil Code an insurer of the safety of the goods and that since the obligation was thus founded upon statute, the three-year period of limitations of section 338 of the Code of Civil Procedure was applicable. The court rejected Buller's proposed counter-findings to the effect that (1) there was no oral subhaul agreement, but simply an oral agreement that BBD borrow a tractor from Buller, to be used in and for BBD's business, and (2) that the accident was due to overloading by BBD's agents.

On appeal, Buller makes basically four contentions.

First, he contends that BBD's cause of action is barred by the two-year statute of limitations of section 339 of the Code of Civil Procedure, which governs an action based upon an oral contract. The complaint was filed December 5, 1967, approximately two years and six weeks after the accident. Buller's argument is that, "The liability in this case, if any, was *created by verbal agreement.* Section 2194 does not create a liability; it measures the extent of the liability and adds to the burden of one who finds himself *under contract to carry goods.*"

Section 2194 of the Civil Code reads as follows: "Unless the consignor accompanies the freight and retains exclusive control thereof, an inland common carrier of property is liable, from the time that he accepts until he relieves himself from liability pursuant to Sections 2118 to 2122, for the loss or injury thereof from any cause whatever, except:

"1. An inherent defect, vice, or weakness, or a spontaneous action, for the property itself;

"2. The act of a public enemy of the United States, or of this state;

"3. The act of the law; or,

"4. Any irresistible superhuman cause."

Buller cites no authority for his assertion that section 2194 of the Civil Code does not create the liability but only measures its extent. On the contrary, section 2194 by its terms makes the carrier strictly liable for loss or injury *from any cause whatever* (with certain specified exceptions), thus going beyond ordinary tort or contractual liability and creating the liability here involved. (See *Brignoli* v. *Seaboard Transportation Co.* (1947) 29 Cal.2d 782, 792 [178 P.2d 445]; *Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal.2d 347, 349 [170 P.2d 448, 166 A.L.R. 198].) It is true that section 2194 does not come into play until it is established that the defendant is an inland common carrier with respect to the property; and ordinarily the defendant's capacity as such arises out of a contract. But the cause of action is not "founded" upon the contract, i.e., it is not based upon any breach of the terms of the agreement; rather the contract serves only to define the *relationship* between the parties. This relationship in turn gives rise to the statutory obligation, which is independent of any term of the contract. "A liability created by statute . . . is an

obligation which the law creates in the absence of an agreement." (*Church* v. *Public Utilities Com.* (1958) 51 Cal.2d 399 [333 P.2d 321]; *Gardner* v. *Basich Bros. Construction Co.* (1955) 44 Cal.2d 191, 194 [281 P.2d 521].) Therefore, this action is governed by the three-year statute of limitations of subdivision 1 of section 338 of the Code of Civil Procedure, and the trial court did not err in this regard.

■ Second, Buller contends that there was insufficient evidence to support the trial court's finding that BBD and Buller entered into an oral subhaul agreement. He argues that "Every circumstance in the case clearly indicates" that he simply sent a driver and tractor with "instructions to serve under the direction of BBD and not to sub-haul," contrary to other occasions when he dispatched both a tractor and a trailer expressly and admittedly for sub-hauling purposes. The significant circumstances he points to are the following:

1. BBD's dispatch agent, Huxford, testified that on every other occasion known to him, Buller used his own trailer when hauling for BBD.

2. Huxford testified that in initiating the transaction, he had called Buller and asked if he had a tractor available, as BBD had a trailer that needed to be in a certain place by morning.

3. Buller testified that Huxford telephoned him on behalf of BBD at about 11:30 p.m. and said " 'I am really in a bind, I thought I had two or three tractors that I'd have in the morning, but they are broke down and I just found out I wouldn't have them, and I'm in a bind, could you help me out?' And I said, you know, 'Sure, I would,' and found out that all he really needed was a tractor because his own tractors were in the shop . . . . I didn't talk to him about price."

4. Buller testified he sent Leroy Sims to BBD with a tractor "to help them out." Nothing was expressly stated about a lease agreement, and Buller testified he did not know that his tractor and driver were going to San Andreas.

5. Sims made several short trips using Buller's tractor, taking a loaded BBD trailer from Livermore to Novato on October 19, 1965, and making two such trips to Novato from Richmond on October 20, in addition to the ill-fated trip from Richmond to San Andreas on October 21, 1965. No lease (subhaul) agreements for any of these trips were found.

6. Buller asserts, without citation to the record, that "the amount charged has no relation to the amount charged for sub-hauling."

7. Finally, Buller submits that there can be no oral agreement for subhauling because General Order No. 102, Public Utilities Rules and Regulations, section 3-A, which was in effect at the time, forbade it.

"Every agreement for subhauling, sub-subhauling, or leasing of motor vehicles entered into by a carrier shall be in writing and signed by the parties prior to, or within five days after, the commencement of any subhaul or sub-subhaul service or lease of equipment. Such writing shall contain all of the terms of such agreement and shall specify all charges payable thereunder for subhaul or sub-subhaul service or lease of equipment, and shall include the name and address of the surety providing the bond required therein as well as the expiration date of such bond."

Despite the foregoing set of circumstances, there was sufficient substantial evidence to support the court's finding of an oral sub-haul agreement. The fact that Buller used his own trailers on every other subhaul occasion is by no means conclusive in determining that this was *not* a subhaul occasion. And Huxford's testimony, even buttressed by Buller's testimony about the manner in which the transaction was arranged, does not foreclose the trial court's determination.

The absence of signed subhaul agreements was explained by Huxford. He testified that BBD's dealings with subhaulers always followed a pattern customary in the trade, starting with a phone call and ending with the signing of a subhaul agreement by the subhauler's driver. Normally, the driver would come to BBD's dispatching office before starting the haul, and would pick up a copy of the agreement; this customarily occurred when the haul originated in the same town as the dispatching office. But in this case the haul did not originate in Antioch, and Buller's driver thus never came by the office at all. When the load originated in a different area, it was quite customary for the driver to make the haul first and sign the agreement afterwards.

A written subhaul agreement for the haul from Richmond to Calaveras County on October 21, 1965, was prepared and signed by Huxford on the evening of October 20, 1965, immediately after the phone call to Buller. It remained unsigned by Buller or his agent because the driver never came to sign it. Significantly, however, freight bills were

sent to BBD, on Napa Drayage and Warehouse Co. forms, for the three trips to Novato. In addition, Buller introduced into evidence at trial, a statement of account with BBD, dated October 22, 1965, containing the following notations:

| | | |
|---|---|---:|
| 10/19/65 | Trip Livermore to Novato | $85.00 |
| 10/20/65 | Trip Richmond to Novato | 50.00 |
| 10/20/65 | Trip Richmond to Novato | 50.00 |
| 10/21/65 | Trip Richmond to Novato | 85.00 |
| | | $270.00 |

The freight bills are inconsistent with Buller's theory that Sims was acting as a temporary employee of BBD under a truck rental arrangement. Buller was not in the truck rental business. He had never rented a tractor to BBD before. Despite Buller's assertion that the amounts billed on the statement of account had no relation to the amount normally charged for subhauling, Robert Brumbaugh, vice president of BBD, testified that the amounts charged were at the same rates BBD was paying all subhaulers for trips from Livermore and Richmond to Novato. On cross-examination, Brumbaugh testified that the last line of this billing from Buller was in error; that the only trip on 10/21/65 was the one in question here, from Richmond to San Andreas, and that this accounted for the apparent discrepancy in the last figure.

Buller's reliance on General Order No. 102 of the Public Utilities Commission is misplaced. At absolute best, the failure to put an oral subhaul agreement in writing violates the General Order; it does not convert an oral agreement into no agreement at all. Moreover, BBD prepared a written subhaul agreement to be signed after commencement of the subhaul, as expressly allowed by General Order No. 102, but neither Simms nor anyone in Buller's behalf ever signed it. To hold that General Order No. 102 affects the enforceability of an oral subhaul agreement under these circumstances, would be to create a veto power over the agreement, enabling a party to take advantage of the other party in the light of subsequent events.

It is apparent from the testimony of both parties that the arrangement under which Sims and the tractor were operating was unclear and lacking in detail. For the trial court to resolve such ambiguity consistently with prior dealings of the parties, in which Buller always acted as a subhauler, is certainly not an abuse of discretion by the trial court.

■ Third, Buller contends that there was insufficient evidence to support the finding that BBD was damaged in the sum of $9,627.24, or any other amount in excess of $1,203.97, or that said damages were reasonable. The $1,203.97 amount conceded by Buller is for hauling charges, trailer repairs and labor to haul the trailer to Stockton for repairs.

Buller does not dispute the fact that BBD actually paid the additional $8,423.27 to the owner of the damaged pipe for repair thereof, pursuant to the latter's billing, but argues that there was no testimony as to the reasonableness of these charges. Brumbaugh testified that BBD had made an investigation, knew what steel was worth, and determined that if it had to buy new pipe, it would cost much more than the repair bill. It also relied upon the manufacturer and owner of the pipe as a reputable firm. This showing is sufficient to support the trial court's finding of reasonableness.

■ Buller's fourth and final contention is based upon the first exception to the liability imposed by section 2194 of the Civil Code. He contends that negligent overloading by BBD created inherent defects, vices, or weaknesses in the trailer and cargo, that were the proximate cause of the accident.

There was considerable conflict at trial as to whether the trailer was overloaded, and if so, to what extent; also as to whether any such overloading was the proximate cause of the accident. Thus the trial court was justified in not finding the exception of subdivision 1 of section 2194 of the Civil Code applicable.

Even assuming, however, that the trailer was overloaded and that the overloading was a proximate cause of the accident, we cannot say that overloading constitutes "[a]n inherent defect, vice, or weakness, or a spontaneous action, *of the property itself.*" (Civ. Code, § 2194, subd. 1.) Moreover, the prevailing rule, and the rule in California is that if the overloading is apparent to the carrier, i.e., the driver, "the carrier will be liable notwithstanding the negligence of the shipper." (*Albers* v. *Greyhound Corp.* (1970) 4 Cal.App.3d 463, 478 [84 Cal.Rptr. 846]; see also 44 A.L.R.2d 984.) There was sufficient evidence from which to conclude that any overloading in this case was apparent to the driver. Thus Buller

could still be properly found liable, notwithstanding any negligence by BBD's agents in overloading the trailer.

The judgment is affirmed.

Friedman, Acting P. J., and Evans, J., concurred.

The petition of appellant Buller for a hearing by the Supreme Court was denied August 6, 1975.